HILLER et ux. v. LADD et al.

(Circuit Court of Appeals, Ninth Circuit. February 14, 1898.)

No. 397.

1. JUDGMENT OF PROBATE COURT—CONSTRUCTION OF WILL—RES JUDICATA.
   Where a will was construed by the probate court having jurisdiction, and the estate distributed thereunder, the widow of the testator, who gave her written consent to such construction, and acquiesced without objection in the distribution, cannot attack the same after the lapse of 22 years in an action against her co-executor, it appearing that she knew all the facts, and that no undue influence was exercised to obtain her assent to the action taken.

2. EXECUTOR—LIABILITY FOR UNAUTHORIZED SALE OF ASSETS.
   An executor who without authority sells corporate stock belonging to the estate is liable only for the loss then resulting to the estate, and cannot be held to account as trustee by legatees for profits made by him some years subsequently in the repurchase and sale of such stock.

3. SAME—ESTOPPEL OF CO-EXECUTOR.
   The widow of a testator, who is also one of the executors, who knows of and acquiesces in the sale of property of the estate without authority of the probate court, cannot hold her co-executor accountable for a loss resulting to her interest as legatee.

4. SETTLEMENT—IMPEACHMENT OF—LACHES.
   Defendant's testator was from 1872 trustee for plaintiff, and managed her estate. In 1880, after two weeks spent by plaintiff and her husband, with an accountant, in examining the books and accounts, a settlement was made of all matters, and a release given by plaintiff and her husband. It appeared that plaintiff then had knowledge, or at least the means of knowledge, of all the facts connected with the management of her estate. *Held*, that she could

not, after a delay of 14 years, and after the death of the trustee, maintain a suit to reopen the settlement, and require a further accounting from his estate.

Appeal from the Circuit Court of the United States for the District of Oregon.

This was a suit in equity brought by D. Albert Hiller and Sarah F. Hiller, his wife, against Caroline A. Ladd and others, as executors of the will of William S. Ladd, deceased.

Philip G. Galpin, for appellants.

Cyrus A. Dolph and C. E. S. Wood, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. This is a suit brought against the executors of the last will and testament of William S. Ladd, deceased, to seek an accounting for 5,700 shares of the capital stock of the Oregon Steam Navigation Company and the dividends received thereon, which stock belonged to J. Wesley Ladd, the first husband of the complainant Sarah F. Hiller, at the time of his death, on February 28, 1871. The facts out of which the suit arose, and concerning which there is no dispute, are as follows:

The Oregon Steam Navigation Company was incorporated October 20, 1862, under the laws of the state of Oregon, with a capital stock of $2,000,000, divided into 4,000 shares of $500 each. Prior to 1868 the owners of the stock of the Oregon Steam Navigation Company had started an opposition to Ben Holladay's steamship lines, and were contemplating still further opposition. They devised a scheme to counteract opposition from that source by placing the ownership of the stock of their corporation ostensibly in the hands of Alvinza Hayward, a citizen of California, and a friend of Ben Holladay and of W. C. Ralston, president of the Bank of California, who was one of Holladay's backers. This scheme was carried out. Hayward consented to the arrangement, received the stock, and assured Holladay that he was the owner of the Oregon Steam Navigation Company. J. Wesley Ladd was at that time the California agent of the Oregon Steam Navigation Company, and an intimate friend of Hayward, and was the active agent in procuring the transfer of the stock to Hayward. About this time the owners of the stock of the Oregon Steam Navigation Company became apprehensive that the Northern Pacific Railroad Company would either put a line of opposition steamers on the Columbia river, or would do business by rail, through its road about to be constructed by the Columbia river valley, so as to destroy or injure their business. They determined, therefore, to make an effort to sell out to the Northern Pacific Railroad Company. The principal stockholders of the Oregon Steam Navigation Company at that time were J. Wesley Ladd, J. C. Ainsworth, R. R. Thompson, S. G. Reed, W. S. Ladd, and C. E. Tilton. In 1868 the capital stock was increased from $2,000,000 to $5,000,000, divided into 50,000 shares of $100 each, and of the total stock 48,125 shares were issued to Alvinza Hayward. Of this he owned in his own right 2,500 shares, which the others gave him as compensation for his part in the transaction. J. Wesley Ladd's proportion of the stock so

held by Hayward was 7,600 shares.    J. Wesley Ladd had been active in inducing the smaller stockholders in Oregon to part with their stock, ostensibly to Hayward, but really to those for whom Hayward held the stock in trust, and he was anxious to conceal the fact that the sale to Hayward was not an actual sale; and, for similar reasons, all of the owners of the stock so held by Hayward were desirous that the true nature of his interest should not be disclosed.    In 1870, J. C. Ainsworth, as the agent of all the stockholders, went East, to negotiate a sale to the Northern Pacific Railroad Company.    He went by way of San Francisco, for the purpose of consulting with J. Wesley Ladd and Hayward.    It had been arranged that all of the stock should be sold, and that Hayward should make the delivery.    Ainsworth was unsuccessful in making a sale, but he returned with the understanding that the railroad company would have the property examined, and later might telegraph him to go East.    If it did so, he would understand that it was prepared to purchase the property at the price which had been given it, of $2,000,000.    Ainsworth returned to Portland by way of San Francisco, and reported to J. Wesley Ladd his failure to sell.    J. Wesley Ladd had been an invalid for some years, and at this time was dying from slow consumption.    In the spring of 1870 he wrote to Tilton, who was in New York, requesting him to arrange with W. S. Ladd for both to come to San Francisco to have a meeting with Hayward and him, to arrange affairs, so that in the event of his death certain matters "you wot of" should "not be brought to light in case I should drop out."    The consultation was had, and the result was that on March 1, 1870, Hayward gave J. Wesley Ladd his note for $190,000, to represent the 7,600 shares of stock which he held in trust.    This was done for the purpose of preventing the necessity of the stock being noticed in any way in the inventory of J. Wesley Ladd's estate after his death, which was then believed to be imminent.    Tilton testifies that J. Wesley Ladd told him that his reasons for making this arrangement were—First, that, in the event of a sale to the Northern Pacific Company, Hayward would be free to deliver the stock without having to obtain authority from the probate court; and, secondly, that no one could trace his ownership of these shares of stock, so that his estate might be free from attack by the former stockholders of the Oregon Steam Navigation Company or others.

J. Wesley Ladd did not die until February 28, 1871.    In the meantime he received from Hayward the dividends on his stock as they were declared and paid, but no indorsement was made of these payments on the note or otherwise.    In March, 1872, the Northern Pacific Railroad Company sent for Ainsworth, and he went East, accompanied by R. R. Thompson.    They went from Portland by way of San Francisco, and obtained from Hayward 22,437 shares, which he then held for J. Wesley Ladd, W. S. Ladd, and C. E. Tilton; Ainsworth, Reed, and Thompson having received back from Hayward the stock which he had held in trust for them.    It was the expectation that every share would be sold to the Northern Pacific Company.    Ainsworth was unable to accomplish this.    The railroad company preferred that he and his associates should hold one-fourth, and manage the property.    He therefore delivered three-fourths of each of

85 F.—45

the said shareholder's stock, and retained one-fourth. The purchase price was $1,500,000, or $40 per share, of which one-half was paid in first mortgage bonds of the Northern Pacific Railroad Company, at 90 cents on the dollar, the other half in six promissory notes of the railroad company, five of which were for $100,000 each, payable, respectively, one, two, five, seven, and nine months from April 1, 1872. The other was for $150,000, and was called the "dividend note." It was to be paid by crediting thereon the dividends on the stock of the Oregon Steam Navigation Company owned by the railroad company as they accrued. Ainsworth returned by way of San Francisco, where he reported the sale to Hayward. He delivered to Hayward the Northern Pacific bonds, to which he was entitled on his own behalf, as well as those to which he was entitled as trustee for Tilton, W. S. Ladd, and J. Wesley Ladd's estate. He brought with him also the dividend note for the purpose of applying dividends thereon, but the other notes were left with C. E. Tilton, in New York, for collection. Tilton collected the notes, and remitted the proceeds to Ladd & Tilton as each was paid. In May, 1872, on receipt of payment of the first note, Tilton went to San Francisco, and arranged with Hayward for canceling the Hayward note to the Ladd estate. W. S. Ladd, Joseph M. French, and the complainant Mrs. Hiller were the executors of the will of J. Wesley Ladd. W. S. Ladd and French had petitioned the probate court for leave to retain the Hayward note as an investment "bearing high rate of interest." The court, however, required that the note be collected and distributed. Accordingly, the note was canceled in the following manner: Tilton gave Hayward his personal draft on his firm in New York for the amount then due on the note, $174,232.19, the principal of the note having been reduced by indorsement of cash received as dividends on Oregon Steam Navigation Company stock. This draft was a matter of form, but it was treated by Hayward as equivalent to cash, and with it he paid his note, which was surrendered to him by the executors. The draft was distributed as cash by the order of the court, and was so entered in the books of account kept for the devisees, but with some words of explanation. Tilton then took to Portland 1,900 shares, the remaining one-fourth of the stock belonging to the J. Wesley Ladd estate. By the will of J. Wesley Ladd, it is stated that he desired that all his property acquired before his marriage be considered community property. He then bequeathed to his wife one half of all his property, and the other half to his relatives, and friends. W. S. Ladd was to receive one-sixth of said moiety. Shortly after the sale to the Northern Pacific Railroad Company, and on May 15, 1872, the complainant Mrs. Hiller executed a paper to be filed in the probate court, reciting that it was the intention of her husband's will to devise one half of his entire property to her, and the other half to his relatives and friends, and assenting to such construction of that instrument, and authorizing the distribution of said estate in accordance therewith. On May 16, 1872, she executed a power of attorney to W. S. Ladd, reciting that in pursuance of the wishes of her late husband, and for the purpose of investing her property, she has

assigned and transferred to W. S. Ladd all her personal property, administered and to be administered, in the matter of the estate of J. Wesley Ladd, deceased, in the probate court of the city and county of San Francisco, and all her property, of whatever description, situated or then being in the state of Oregon, to have and to hold the same unto the said William S. Ladd during the period of his natural life, the death of either terminating the transfer, and declaring that the estate is assigned in trust to safely invest and keep invested the same according to the judgment of said W. S. Ladd, and to render an account to her at least once a year, and that the assignment in trust may be annulled and revoked by an instrument in writing to that effect, signed, sealed, and acknowledged by her, and that said W. S. Ladd may renounce the trust on reasonable notice to her, and accounting and transferring. The 1,900 shares belonging to the estate were thereafter held in two certificates of 950 shares each, in the name of E. Quackenbush, trustee. The complainant thereupon went to Europe, and remained there until early in 1874. In the meantime the Northern Pacific Railroad Company had become insolvent. Jay Cooke had advanced to it large sums of money, and had taken as security therefor the three-fourths interest in the Oregon Steam Navigation Company stock. In 1873 he became insolvent, and his trustee in bankruptcy made a dividend of this stock to his creditors. It was thus scattered, mostly in the Eastern states, in various small holdings, of from 2 or 3 shares up to 100. Some of the former owners of this stock knew its prospective value, and Ainsworth, Reed, Thompson, Tilton, and W. S. Ladd formed a pool of five for the purpose of purchasing it. Each was to be equally interested. Ladd & Tilton were to advance the funds for the purchase, and were to retain the stock as security. Tilton, in New York, was made the purchasing agent. He discovered that it would be desirable to have C. B. Wright, who had been one of the directors of the Northern Pacific Railroad Company, and identified with it, associated with him for the purpose of ascertaining where the stock was, and acquiring it. Wright was made a sixth member in the pool, but, as he desired to conceal his connection with the transaction, his interest was carried in the name of E. Quackenbush, trustee, who was then cashier of the bank of Ladd & Tilton. The pool acquired the majority of the stock, but later Henry Villard and W. H. Starbuck, of the Northern Pacific, demanded to be let into the pool. Their demand was complied with, but their names were concealed so far as possible, Starbuck and Villard jointly holding one-seventh, and the pool consisting of seven interests. On May 22, 1879, Villard, on behalf of himself and his associates in New York, took an option for the purchase of four-fifths of the entire stock of the Oregon Steam Navigation Company; and on July 1, 1879, the same was sold and transferred to the Oregon Railway & Navigation Company, at the par value of the stock, one-half of which was paid in cash, and one-half in bonds and stock of the purchasing corporation,—20 per cent. in bonds, and 30 per cent. in stock. On December 16, 1879, W. S. Ladd, being still the attorney of Mrs. Hiller, received the bonds. In a letter written to her on August 22, 1879, he stated that $50 per

share in cash was all that had been received on account of her 950 shares. In May, 1880, the complainant, believing that W. S. Ladd was concealing her funds, came to Portland to investigate matters, and to insist upon a settlement. She was accompanied by her husband and an expert accountant. Ainsworth came on the same steamer with her. Prior to this time the books and papers showing her account with W. S. Ladd had been sent by him to her in San Francisco. A settlement was arrived at between W. S. Ladd and Mrs. Hiller. She executed a general release to him of all the matters from the beginning of the world to that time, and he surrendered to her the property which he held under the power of attorney. On July 21, 1894, the present suit was begun.

The substantial allegations of the bill of complaint are that J. Wesley Ladd and W. S. Ladd were jointly interested in manipulating the stock of the Oregon Steam Navigation Company, and that, at the time of the death of said J. Wesley Ladd, Alvinza Hayward held in his own name, in trust for him, 7,600 shares of the stock of said corporation; that, for many years prior to the death of J. W. Ladd, W. S. Ladd held his power of attorney, and managed their stocks in said corporation without interference on the part of J. Wesley Ladd; that, in the will of J. Wesley Ladd, he expressed the earnest desire that his wife should place her property in the hands of W. S. Ladd to invest and manage for her, as he had the utmost confidence in his ability and integrity; that he also stated in his will, "It is my desire and request that the property acquired before my marriage be considered and treated as community property, and not as separate property;" that in fact, at the death of J. Wesley Ladd, one-half his property belonged to his widow in her own right as survivor, under the laws of the state of California, and she was entitled, under said law, to receive one-half of the other moiety of said property; that the will of J. Wesley Ladd was admitted to probate in San Francisco, on March 8, 1871, and W. S. Ladd, J. M. French, and the complainant Sarah F. Hiller were appointed executors; that Mrs. Hiller permitted W. S. Ladd to assume, and he did assume, as executor of said estate, the exclusive management thereof in the probate court, she acting only to execute such papers as she was told to execute by him; that on May 15, 1872, the said W. S. Ladd caused to be prepared, and procured Mrs. Hiller to execute, an instrument admitting that it was the intention of the will to bequeath to her one half of the property of the estate, and to the other legatees the other half, and to execute to him, on May 16, 1872, a trust conveyance of all her property, and a power of attorney, under which he took possession of all the estate of Mrs. Hiller, and managed her property as her agent and trustee until his death, in January, 1893, except that in 1880 he surrendered to her the proceeds of 950 shares of Oregon Steam Navigation Company stock, and from time to time paid her sums of money for her use; that there has never been any settlement and accounting between her and said W. S. Ladd; that, during her absence in Europe, said W. S. Ladd filed his final account in the probate court in San Francisco in the matter of J. Wesley Ladd's estate, and on September 12, 1872, fraudulently pro-

cured a decree of distribution to be made therein, whereby the court distributed to her but one-half of the estate instead of three-fourths, to which she was entitled, the other one-half being distributed to the other heirs of said J. Wesley Ladd, of whom W. S. Ladd was one; that her consent to such division of the estate was fraudulently procured; that W. S. Ladd caused the paper to be drawn up, and advised her to execute the same, and he and his agents and attorneys represented to her that it was necessary for her to execute said paper, and that the intention of said J. Wesley Ladd was to give to her one-half only of his entire estate; that the procurement of said paper by W. S. Ladd was in violation of his trust, and that he ought in equity to be charged with the one-fourth of the estate which was lost to her thereby; that the said W. S. Ladd fraudulently omitted from the inventory of J. Wesley Ladd's estate 7,600 shares of the capital stock of the Oregon Steam Navigation Company; that said concealment was rendered more easy because the books of account of said J. Wesley Ladd were either lost or taken possession of by said W. S. Ladd, and the stock stood in the name of Alvinza Hayward on the books of the corporation, and the certificates were either in the possession of Hayward or W. S. Ladd, and their existence was unknown to the complainants; that in March, 1879, W. S. Ladd made known to the complainant that he had purchased for her 950 shares of the stock of said corporation, and this was her first knowledge of ownership of any shares of such stock, and he falsely pretended that he had purchased said 950 shares from C. E. Tilton, and that he had paid therefor $33,250, and complainant did not discover the falsity of this statement, nor her ownership of the block of stock which was owned by J. Wesley Ladd at the time of his death, until within less than three years before the commencement of the suit, and that she did not discover the proofs sufficient to enable her to recover said stock or its value until within the last three months; that 7,600 shares of the stock held by Hayward in the Oregon Steam Navigation Company were held in trust for J. Wesley Ladd; that an executory contract was made in the interest of all the owners of said stock, to sell three-fourths thereof to the Northern Pacific Railroad Company, for $40 per share, payable one-half in cash, and one-half in bonds of the said company, at 90 cents on the dollar of their par value; said sale was then considered by all the sellers to be a very desirable one, and each of them delivered three-fourths of his stock so sold, except that W. S. Ladd, acting on behalf of the estate of J. Wesley Ladd and of the complainant, did not sell any part of said 7,600 shares, and no entry or memorandum of the sale thereof was ever made in the complainant's book of accounts kept by said W. S. Ladd, nor was she ever informed by him of the sale of any part of her stock, but said W. S. Ladd caused his own stock to be delivered on said sale, and himself received the proceeds thereof, and did not pay over the same or any part thereof to the complainant, nor did he sell any of her stock, but kept and retained, in Hayward's name, all of her stock until 1879; that in July, 1873, the Northern Pacific Railroad Company was in great financial straits, and was unable to pay interest on its bonds, whereupon said W. S.

Ladd craftily contrived and attempted to substitute the said stock of the estate and of the complainant in lieu of his own stock, so sold as aforesaid, made entries in complainant's books kept by him, dating the entries as of July 28, 1873, whereby he attempted to make it appear that he had received for her at that date a dividend from said Oregon Steam Navigation Company on 950 shares of its stock; that said 950 shares was equal to one-fourth of 3,800 shares which belonged to her under the decree of distribution, as said decree distributed to her but one-half of 7,600 shares; that until said entry of July 28, 1873, was made, the books of account furnished her by W. S. Ladd did not disclose, nor did she know until August, 1877, that he held any stock of said Oregon Steam Navigation Company in which she had any interest; that the more effectually to conceal from her her interest in said 7,600 shares, and for the purpose of accounting for the appearance of said 950 shares, he wrote her, as of July 17, 1879, stating as follows: "Your account is now closed with Ladd & Tilton. You will observe March 19th last sent you a trial balance of your books, on which appears O. S. N. Company stock, 950 shares, costing $33,250. The trial balance of July 25, shows this stock sold, netting you a profit of $9,450;" that said statement was false, and was intended to mislead the complainant, and prevent her from learning the truth in regard to said stock; that said W. S. Ladd did not purchase said 950 shares of stock at that time, nor was the same sold by said Tilton, but, according to the account of said Tilton, there being at that time due to her the sum of $33,250, the said 950 shares of stock was used to offset that sum, and she was thus made, in effect, to pay $33,250 for stock which already belonged to her; that after said sale and transfer to the Northern Pacific Company, or to Jay Cooke, the greater portion of the stock belonging to the complainant remained standing on the books of the corporation in the name of Hayward or Charles E. Tilton, in all 4,984 shares, all of which, excepting 631 shares, were subsequently transferred to E. Quackenbush, trustee, who was the confidential clerk of said W. S. Ladd, and said shares were held by him in trust for the complainant until they were sold and transferred to Henry Villard, as later stated; that, of said 7,600 shares, 3,800 belonged to her in her own right, and 1,900 were bequeathed to her under the will of said J. Wesley Ladd, and all of said stock passed into the hands of W. S. Ladd as her trustee, and the proceeds thereof came into his hands; that on May 23, 1879, W. S. Ladd sold and thereafter transferred to Henry Villard said 5,700 shares of stock belonging to the complainant, and received therefor about $570,000, one-half paid in cash and one-half in bonds and stocks of the Oregon Railroad & Navigation Company, at the par value of each, and said W. S. Ladd has never accounted to the complainants for any of said stock excepting 950 shares, which was reported by him to have been purchased for her as per his letter of July, 1879; that, soon after said sale to Villard, W. S. Ladd wrote the complainant on four occasions that he had sold said 950 shares of stock to Villard for 50 per cent. of its par value, flat cash, but neglected to add that the other 50 per cent. had been paid to him in bonds or securities, and on August 22, 1879, wrote

her that $50 per share was all that he had received for said 950 shares, and that there was nothing more coming to her from said sale; that subsequently she learned, through other persons, that that statement in said letters was false, and that said stock had been sold for nearly twice the amount reported to her by W. S. Ladd; that on January 29th she wrote him of her discovery, and on February 12, 1880, he wrote her admitting that he had received the other 50 per cent. of said stock in stocks and bonds, and that her books, as kept by him, would show that fact; that on February 10th she demanded that said books be sent to her for examination, and said stocks and bonds so received; that on March 18, 1880, the books were sent to her; that on May 29, 1880, she went to Portland, and demanded her stocks and bonds, and said W. S. Ladd refused to deliver the same unless she should first execute a general release to him of all claims and demands which she had against him, and she, not knowing that she had any claims against him for her interest in Oregon Steam Navigation Company stock other than said 950 shares, executed such general release; that she was also induced to execute the same because the books, accounts, and vouchers delivered and surrendered by said W. S. Ladd to her were made and formed in such a manner that she could not discover that there was any portion of her property unaccounted for, and said books and accounts were designedly so drawn and prepared as to effectually conceal the fact that J. Wesley Ladd, at the time of his death, owned any O. S. N. Company stock, and, when she executed said release, she was ignorant that J. Wesley Ladd, at his death, owned 7,600 shares of such stock; that, a short time before the death of said W. S. Ladd, a rumor came to the ears of the complainant that in some way she had been defrauded by him, but in what way, or to what extent, or in what manner, she could not learn. Thereupon she employed an expert accountant to examine her correspondence, accounts, books, and papers, and ascertained that said J. Wesley Ladd had owned 7,600 shares of the Oregon Steam Navigation Company stock, and detected the concealment of the same in the books of W. S. Ladd, and that he had fraudulently substituted therefor, in the inventory of J. Wesley Ladd's estate, a pretended note of Hayward for $190,-000. The bill then further alleges that if it was true, as said W. S. Ladd falsely pretended, that said shares of stock belonging to the complainant were sold to Jay Cooke, then it became the duty of said W. S. Ladd, as trustee for complainant, to buy back said stock upon the same terms and conditions upon which he bought back stock for himself; that, at the time of the repurchase of said shares, W. S. Ladd held moneys, securities, and other property of complainant's sufficient to enable him to purchase said stock for her account. The prayer of the bill is that an account may be taken of the said 7,600 shares of stock of the Oregon Steam Navigation Company received by said W. S. Ladd, and of the dividends thereon collected by him, and of all the property of the complainant received by him as trustee.

Upon the appeal to this court, one of the theories on which the bill is framed, and one series of its allegations, are abandoned. It is not con-

tended now, as charged in the bill, that, on the sale to the Northern Pacific Railroad Company, J. Wesley Ladd's shares of stock were held out of the sale by W. S. Ladd, and were placed among the reserved one-fourth, in order that W. S. Ladd might, upon his own stock, obtain all the advantage to be acquired by the sale; nor that subsequently, upon the discovery of the bankruptcy of the railroad company, fraudulent entries were made in the books kept by W. S. Ladd, so as to show that J. Wesley Ladd's stock had been included in the sale; nor is it now disputed that Hayward actually signed the note for $190,000 which was inventoried in the estate of J. Wesley Ladd, deceased, or that there was credited on said note the dividends declared upon J. Wesley Ladd's stock as the same were paid, or that three-fourths of J. Wesley Ladd's stock so held in Hayward's name was sold when the other stock was sold, and upon the same terms. The appellants base their claim to relief, as their cause is presented in this court, upon the following contentions: First. That W. S. Ladd acted in fact as the sole executor of his brother's estate, and that he fraudulently procured Mrs. Hiller to sign the instrument whereby she consented to the distribution of the estate on the basis of one half to her, and the other half to the other legatees thereof, whereas in fact, under said will, she was entitled to three-fourths of the estate, and that thereby said W. S. Ladd became accountable to her for the one-fourth of said estate which was diverted to the other legatees. Second. It is contended that W. S. Ladd unlawfully permitted the sale of J. Wesley Ladd's Oregon Steam Navigation Company stock to the Northern Pacific Railroad Company; that said stock should have been taken into the estate, and inventoried as a portion thereof, and that inasmuch as the sale was made without authority of law, and without an order of the probate court, he became responsible, and his estate is now responsible, to account to the complainant for the highest value to which said stock at any subsequent time attained. Third. It is contended that, if said stock so belonging to Mrs. Hiller was sold with the other stock, it became the duty of W. S. Ladd, as her trustee, to permit her to share in the benefits and profits which were made by repurchasing the stock as the same was purchased by himself and others in what is called the "Repurchase Pool."

It is impossible to read the testimony concerning J. Wesley Ladd's stock in the Oregon Steam Navigation Company, its transfer to Hayward, and the execution of the $190,000 note in lieu thereof, without arriving at the conclusion that, beyond any doubt, the complainant Mrs. Hiller knew all the attendant circumstances. In the first place, she does not anywhere in her testimony deny that she had such knowledge. The general trend of her testimony is that she does not now remember the facts. When asked whether or not her husband, shortly before his death, did not discuss with her the condition of his estate and her probable means of livelihood, she answered:

"I could not give you any exact words or anything of that sort, but I would not say that he did not. It is more than probable that he did. Q. Did he not give you some idea in what his wealth or income-making property consisted? A. Yes, sir; I think he did, but I could not tell you now. Q. At the time that the estate was being settled up, in 1871, you knew that, as a part of the assets of that estate, there was O. S. N. stock, did you not? A. I could not tell you now

whether I knew it or not.  Q. Are you prepared to say that you did not know it?  A. No, sir; I would not say that."

When she is interrogated as to her knowledge of certain suits, called "Oregon Steam Navigation Company suits," that were then pending against some of the purchasers of the stock which had been transferred to Hayward, her answer was that she presumed she was familiar with them at that time, but could not give the history of them now, and that she has heard of the Oregon Steam Navigation Company suits.  Concerning the execution of the paper of May 15, 1872, whereby she assented to the division of the estate into moieties, it appears from her own testimony that the paper was prepared by Mr. E. E. Haft, who was J. Wesley Ladd's lawyer; and from the testimony of Mr. Tilton and of Mr. Haft it appears that the idea of so construing the will originated with the attorney and with Mrs. Hiller herself.  They were both present when she signed the instrument in San Francisco.  Mr. Haft testifies that the instrument was prepared at Mrs. Hiller's request; that she executed it readily; and that he distinctly recollects that she remarked that she was satisfied that it was the intention of her husband that she should have only one-half of all the estate.  He testifies that in none of these matters of the estate had he any instructions from W. S. Ladd, but that he talked with Mr. French, one of the co-executors with Mr. Ladd, and he had no knowledge of any instructions coming through Mr. French, from W. S. Ladd; that he was first requested to prepare these papers by Mr. French, on behalf of Mrs. Hiller, and that he declined to do so without seeing her personally; she was then brought down to his office, and he read to her and explained both of them; that he told her that the will might possibly be construed so as to give her three-fourths instead of one-half of the estate.  Mrs. W. S. Ladd testifies that on a visit received by her from Mrs. Hiller, soon after J. Wesley Ladd's death, she said Wesley had done right in giving the other heirs the other half, and expressed herself as perfectly satisfied, so far as it concerned herself, with the distribution made by her husband of his estate.

It appears from the evidence that J. Wesley Ladd was the originator of the Hayward pool.  His own correspondence shows this, and reveals the intimacy of his association with Hayward.  On December 28, 1869, he wrote to Tilton regarding a prospective meeting between himself, Tilton, and W. S. Ladd, and said of the latter: "I want very much to see him, and have a good long talk.  Besides, I deem it prudent to arrange my little affairs, so that, if I should drop out, it will not necessarily bring to light matters we desire to remain dark.  If I can get you, William, and Hayward together a day or so, can arrange for any contingency."  In his letter to Tilton, May 5, 1870, he says: "I expect you have seen Ainsworth, and hope there is a prospect of selling out to the Northern Pacific people."  Mr. Tilton testifies that Hayward had received from J. Wesley Ladd full power to sell the stock.  "He made an arrangement with Hayward that Hayward should take his stock, and have full control of it,—full power to sell; and he [Hayward] gave his note for $190.000, with the understanding that, should a trade be made with the Northern Pacific, he should have the full benefit of it.  *  *  *  That it would be easier, and facilitate, if he

should die, the settling of his estate, and keep his stock out of the probate court, and not tie it up so but what it could be sold." He testified that J. Wesley Ladd had told him that he had "told his wife the whole story, and she understood it, and what it was done for." W. S. Ladd, in a letter to Tilton, of March 14, 1871, wrote: "That note to Hayward,—$190,000,—that will be all arranged. I have the utmost confidence, as Wesley talked both to me and Sadie together about that and the stock. The note was simply given purposely so that could settle his estate, which I feel confident is all right. * * * Hope the N. P. R. R. will purchase; so can clear the whole thing up." In a letter to Tilton of March 31, 1871, he wrote: "A. [Ainsworth] told Sadie that had sold, and amount." Then follows an instruction to tell French, lest he should feel hurt at their not giving him their confidence. In another letter to Tilton, September 21, 1872, when it was reported that Mrs. Hiller was about to marry again, W. S. Ladd wrote: "Under all the circumstances, Charles, I do not want Sadie to take all her property from my control until after these O. S. N. Co. suits are determined or settled. Sadie knows all about them, knows just how they are fully,—why they were brought, etc., for Wesley told her all about matters. * * * She must leave behind enough to cover her proportionate share of the expenses." Tilton testifies that when he arrived in San Francisco, in May, 1872, French knew all about the sale, and informed him that he got it from Mrs. Hiller, and that Ainsworth had told her all about it. In her letter to W. S. Ladd, of June 4, 1872, Mrs. Hiller writes: "I am much pleased at the late sales, and to have things settled up before going away." After her husband's death, and before the sale, she went East; and on the train going to Boston, with Tilton, the latter testifies that she asked him what he thought she could get for her Oregon Steam Navigation stock. Among the papers left by J. Wesley Ladd was an instrument which in the testimony is called a "trial balance." The attention of the complainant was called to this paper, and she testified that she supposed "she saw it at the time." It contains entries of several items of property belonging to J. Wesley Ladd's estate, among others the entries, "O. S. N. Company's stock, $43,898.90," and "O. S. N. Co., $6,005." In a letter written by Mrs. Hiller to W. S. Ladd, on June 16, 1875, she says: "Inclosed is a copy of an old trial balance of Wesley's, and those things you find marked with a cross I wish you would tell me about. I see there three assessments paid on an iron stock of some over $1,000 each." Upon the paper which she so referred to are now found marked with a cross the items concerning which she wished information. The items referring to Oregon Steam Navigation Company stock are not so marked. The inference is that she needed no information concerning those entries.

There is nowhere in the record a word of denial of any of this testimony, nor is there any evidence whatever tending in any way to rebut it. It stands unexplained and uncontradicted. The testimony clearly shows that all that was done in reference to the construction of the will and the distribution of the estate of J. Wesley Ladd was done at the instance of and with the full knowledge and acquiescence of his widow. There is no evidence whatever upon which to base a charge of fraud or undue influence on the part of W. S. Ladd, or to show that he took any

steps whatever to procure the result.    So far as the evidence affords information, Mrs. Hiller was as fully advised, as was he, concerning the Hayward pool, and the sale of the stock by Hayward, and acquiesced in all that was done.    The same is true concerning the decree of the probate court construing the will, and ordering the distribution of the estate.    There is no evidence whatever that W. S. Ladd in any way influenced the complainant or her counsel or his co-executor, French; but all of the evidence which the record affords goes to show that Mrs. Hiller, at her own instance, voluntarily adopted a construction of the will which she believed to be in accordance with her husband's wish, and caused the written consent to be prepared by her attorney.    Mr. Haft, it is true, was the attorney of W. S. Ladd and of the Oregon Steam Navigation Company in San Francisco; but his employment for the estate was not suggested by W. S. Ladd.    Hayward had suggested an attorney to Mrs. Hiller, but she had rejected the suggestion, and had employed Mr. Haft, for the reason that he had been her husband's attorney.    No attempt is made to contradict Mr. Haft's testimony as to the circumstances under which the paper was prepared and executed. In short, the whole of the evidence on which the court is now asked to set aside, in effect, the judgment of the probate court of San Francisco, made and entered with full knowledge of all the parties, more than 22 years before the commencement of this suit, is that Mrs. Hiller, on giving her testimony in this case, testifies that she does not now recall what her husband told her concerning the Hayward pool and his Oregon Steam Navigation Company stock, and that she has no recollection of the circumstances attending the settlement of the estate, and that she signed whatever was handed to her, and did not know what she signed.    Her own letters written at this period show that, although her health was delicate, she was a woman possessed of more than ordinary intelligence, able to discuss her business matters, speculating in stocks and real estate, traveling, enjoying her life, and spending her money freely, and in every way capable of understanding all business transactions to which she was a party.    It is unnecessary to discuss the question whether the executors of the J. Wesley Ladd estate could have obtained the possession of the stock which was in Hayward's hands, or whether it was their duty to endeavor to do so. All who were interested in that stock earnestly desired that the proposed sale to the Northern Pacific Railroad Company should be effected. All admit that it was an advantageous sale.    W. S. Ladd took no active part in negotiating the transaction.    He evidently believed it would be for the best interest of his brother's estate that it should go through, and he expected upon its completion to settle up the estate.    He, as legatee, was entitled to one-twelfth of the stock, and to that extent he was interested in the sale.    There is no evidence that he sought any benefit to himself from the sale of the other eleven-twelfths, or that he had any motive except to do what, in his judgment, was for the best interest of Mrs. Hiller as well as of the other legatees.    It cannot be shown that it would have been to her interest to have taken the stock out of Hayward's hands, or to have sold it at probate sale.    It was not until 1879 that it reached a price greater than that which was obtained in the sale to the Northern Pacific.    Taking all the evidence

into consideration, it is insufficient to entitle the appellants to relief either as to the distribution of the estate in probate or the sale of the stock in the Hayward pool. This is our conclusion, irrespective of the effect of the settlement made in the year 1880 and laches in bringing the present suit. The probate court of the city and county of San Francisco had jurisdiction to construe the will of J. Wesley Ladd, and to decree final distribution of the estate. It entered a judgment construing the will, upon the written assent of Mrs. Hiller, and its decree of final distribution based thereon remains unattacked or impeached in that court, and has not been appealed from.

The appellants further contend that in equity W. S. Ladd was under obligation to admit Mrs. Hiller to the repurchase pool, and that he must be deemed to have repurchased for her benefit her proportion of the stock of said corporation, and that his estate is now chargeable with the profit which he realized thereon. It is argued that an executor who has permitted stock of the estate to be sold without decree or confirmation by the probate court cannot thereafter buy it in for himself, and sell it at a profit, without accounting to the estate for so much thereof as he has so permitted to be sold contrary to law, at the ratio of the profit which he derived upon the resale; and it is said that for the first year, at least, of the time covered by the purchases for the pool, Mrs. Hiller had sufficient money in the hands of W. S. Ladd to have enabled her to come into the syndicate. The first year of the syndicate was 1876. At the beginning of that year, it is proven, and is not disputed, that Mrs. Hiller owed W. S. Ladd an overdraft of more than $3,000, and that at the end of the year the overdraft was considerably larger, and that the only assets in his hands belonging to her were her 950 shares of Oregon Steam Navigation Company stock, and some city bonds in which her money had been invested, and which were paying a good rate of interest. It would have been impossible for him to have invested her property in the repurchase of Oregon Steam Navigation Company stocks, except by selling either her shares in that corporation or her city bonds. The repurchase of the stock was purely a matter of speculation. The purchasers believed, and evidently with good reason, that the stock was of greater value than the prices which they were required to pay, but they incurred the risk of losing by their investment. In any possible view of the repurchase, it was a transaction which in no way concerned Mrs. Hiller. If it is true, as contended by counsel for appellants, that W. S. Ladd, as executor, did cause to be sold unlawfully the shares of stock which his brother held in the Hayward pool, and thereby became accountable to Mrs. Hiller for the loss which she sustained, the demands of justice would be satisfied upon his accounting to her for her damage thereby sustained, and there would be no further accountability to her for any subsequent dealing by him in stock of the same company. If, on the other hand, he did not cause the sale of the stock to be unlawfully made, and if she knew and acquiesced in that sale, as we have found that she did, then likewise it follows that he was as free to speculate or invest in Oregon Steam Navigation Company stock thereafter as in any other stock, and owed no duty whatever to her in relation thereto. There was no partnership relation between W. S. Ladd and Mrs. Hiller, or between any of the members of the

Hayward pool. They sustained no relation to one another such that equity required that all or any of the members of the Hayward pool should have the opportunity to become members of the repurchase pool. It is intimated in one of the appellants' briefs that probably, as a matter of fact, Mrs. Hiller was in the pool at first, and our attention is directed to the fact that the number of shares standing in W. S. Ladd's name was 9,448, while Wright had about half that number. But it is shown that the shares standing in W. S. Ladd's name covered the 950 shares of the complainant, the 950 shares belonging to the heirs of J. Wesley Ladd's estate, besides the shares which W. S. Ladd held for others and in his own name prior to the repurchase, and prior to the time when Wright was admitted to the pool. Aside from this, all of the surviving members of that pool testify that neither Mrs. Hiller nor Hayward was in the pool.

But it is unnecessary to further discuss the transactions concerning which the accounting is sought. The settlement between W. S. Ladd and the complainants in 1880 was final and conclusive of all matters which are made the subject of the present controversy. The circumstances leading up to that settlement are as follows: Early in the summer of 1872, immediately after signing her power of attorney to W. S. Ladd, Mrs. Hiller went to Europe. While there, it is shown that she spent her money freely and extravagantly. January 10, 1873, she wrote to W. S. Ladd for a $10,000 letter of credit, and says: "I know exactly where all the money goes, and it does go." In one of her letters she mentions a purchase of laces amounting to $2,000. In another she refers to herself as having the reputation of being a gay widow, but says it is undeserved. Within 18 months after her husband's death, she announced her engagement to be married. By December, 1872, in addition to $8,500 allowed her by the probate court, she had drawn from W. S. Ladd more than $15,000. The following year she drew over $21,000; the following year $19,000; and by December, 1875, she had drawn $91,579.78. After her return from Europe, in 1874, she speculated in stocks in San Francisco. Mr. Ladd was constantly writing her, cautioning her against her extravagance and stock speculation. On June 16, 1875, referring to the fact that he had written her that she had drawn $81,239, she wrote: "With regard to the $81,239, I have lived and invested the best I knew how under all the circumstances; and if I have learned, like hundreds of others, to shun stocks as a pestilence or a ravening death, why, I have no one but myself to blame for any foolish act of mine." On November 27, 1875, she wrote: "I hope I shall not be disappointed in getting the other $5,000, for on it hangs my fate. I am going to keep trying; if I am pushed under at one point, try until I rise to the surface elsewhere." On March 19, 1879, W. S. Ladd wrote her: "Inclosed please find copy of trial balance of your books up to date. You have received $101,027, while the income from the estate, your portion, has been only some $61,726.43, showing you have drawn over and above your income $39,273.84. This latter sum is drawn on the principal. This being kept up will in time find the end." On March 28, 1879, she answered: "No person realizes the error of my ways

more keenly than does my individual self, although it may not appear so to you." Writing to Tilton, April 29, 1879, directing him to sell some of her Northern Pacific stock, she said: "I shall not write to William for any more money this year. He wrote me a scorcher." On May 14, 1879, she wrote Tilton: "I was not angry with William for what he wrote me. On the contrary, I acknowledged his superior wisdom in managing my business affairs, and in giving me advice or suggesting what I ought to do." In 1879 she was contemplating a second trip to Europe. On May 16th of that year, she wrote to Tilton: "You must not think I am going to be as extravagant over in Europe this time as I was before." On August 24, 1879, W. S. Ladd wrote her thus: "Sadie, please let me make one suggestion. Don't touch stocks of any sort or kind. Where one makes, thousands lose. Nothing would induce me to touch them." On December 22, 1879, she telegraphed Tilton to sell more of her Northern Pacific stock; and she wrote him, referring to the quotations for the stock, and showing that she had been watching the stock market, and stating: "The reason I want to sell those odd 68 shares is because I need the money. * * * Our stock market here has gone clean out of sight." The plan to conceal from Mrs. Hiller some of her property was first suggested to W. S. Ladd by Mr. Tilton in 1874. Mr. Tilton so testifies, and says he told Mr. Ladd that, if he did not, it was more than likely he would have her on his hands to support. When Mr. Ladd received the proceeds of the sale to Villard, which was paid, one half in cash, and the other half in stocks and bonds, he decided to conceal from Mrs. Hiller the fact that a portion of the purchase price was paid in bonds and stocks, and he reported to her that he had received cash for her stock at $50 per share. In a subsequent letter to her, he substantially repeated that statement. In January, 1880, from a conversation with Ainsworth, in San Francisco, Mrs. Hiller discovered the real terms of the sale. On January 29, 1880, she wrote to W. S. Ladd, announcing her discovery. In answer to her letter, W. S. Ladd wrote, on February 27, 1880: "An inspection of your accounts renders any remark concerning the management of your affairs wholly unnecessary. At the same time, such inspection will disclose the motive which actuated me in reporting to you only the cash transaction in the sale of O. S. N. Co. stock. You have drawn $151,645.18 in addition to the allowance by probate court during the years 1871 and 1872, $8,500; in all, some $160,145.18; and the investments made by you, so far as I have any knowledge, do not exceed $25,000. I therefore concluded that, should you become apprised of the full avails received on the sale referred to, it would serve to stimulate the extravagance against which I have heretofore taken occasion to caution you. To prevent any complications in the event of my death, I have taken the precaution of placing the bonds and stock in a package, indicating thereon the interest that I had therein as your attorney, and as trustee for the legatees, personally. Besides, your books would have disclosed the true condition of your affairs." That the books did show the true condition of her affairs was proved on the trial, and also the fact that her bonds and

stocks had been placed in a package in her box in the vault. On March 3, 1880, Mrs. Hiller wrote to W. S. Ladd: "Whatever claim you have against me, you will please make a statement of the items and amount of same, send it to me, and, if correct, it will be promptly paid. I must, however, request that you send me at once my books of account and a statement of all securities you hold for my account, so that I may examine same." On March 26, 1880, she wrote, acknowledging the receipt of the books and papers, and informed him that they were receiving her attention. She had already informed him that she had felt it her duty to consult an attorney as to the proper course to pursue, and said: "Of course, my only desire is a prompt and peaceable settlement of our business matters." On May 29th, Mrs. Hiller, with her husband and an expert accountant, accompanied by Capt. Ainsworth, went to Portland for the purpose of having a "full and complete" settlement. After examining the papers and inquiring into matters, on June 15, 1880, she and her husband executed an instrument whereby they released and forever discharged W. S. Ladd, his heirs, executors, and administrators, from all manner of actions or action, cause or causes of action, debts, dues, sums, and money, claims, and demands whatsoever, in law or in equity, which they, or either of them, ever had or then had, by reason of "any matter, cause, or thing whatsoever from the beginning of the world to the date of these presents."

It is the contention of the appellants that the settlement was conclusive only as to the 950 shares of Oregon Steam Navigation Company stock which Mrs. Hiller held at that date, and that at the time of the settlement she was not aware that any greater number of shares had belonged to her husband's estate, or that any of her stock had been sold in the Hayward pool. It is possible, but not probable, that in 1880 Mrs. Hiller had forgotten the facts in regard to the Hayward pool, but, if she had, her attention was then pointedly and sufficiently directed to them. In arriving at the settlement at Portland, Van Bokkelen, her accountant, who was also her accountant in preparing for the present suit, particularly noticed the entries on the statements furnished by W. S. Ladd showing various payments through C. E. Tilton to Mrs. Hiller's credit, and indicating that the principal portion of her funds came from that source. It is hardly to be conceived that in a hostile settlement, such as was then had, and with the period of two weeks in which to examine into matters preparatory to executing a release which was intended to settle all things, "from the beginning of the world" until that date, the accountant did not in fact ascertain what was the source of the payments which came through Tilton, never inquired what became of the Oregon Steam Navigation Company stock which was mentioned on the trial balance left by J. Wesley Ladd, and never ascertained the facts concerning that stock and the Hayward pool. Van Bokkelen's relation to the suit is not that of an accountant only. By his own admission, he is interested in the result of the suit, and is to receive a share of any moneys that may be recovered by the complainants. It is in evidence, further, that in 1874 Mrs. Hiller's memory concerning these matters had been refreshed by an investigation

which was then made of her affairs. On her return from Europe to New York, it appears that she was alarmed at the rapid diminution of her estate, as reported to her by her trustee, and expressed to the witness George Alexander, who was her friend, and at that time was expecting to marry her, her fear that all was not right with the management of her estate. Alexander thereupon, with her consent, proceeded to investigate her affairs, caused her to send for a statement, and, when it was received, placed it in the hands of an attorney. The attorney investigated the statement, corresponded with persons in Oregon, discovered that she had large holding of Northern Pacific bonds, and learned that the same had been received in exchange for Oregon Steam Navigation Company stock, or that they stood upon her account in place of such stock. He believed that she had been fraudulently dealt with in that matter, since Northern Pacific bonds were then of little value, and he prepared a complaint for a suit against W. S. Ladd. In a conference at which she, the attorney, and Alexander were present, the attorney read to her the complaint, in which it was charged that her Oregon Steam Navigation Company stock, to the amount of about $270,000, had been fraudulently exchanged by her trustee for worthless Northern Pacific bonds. Mrs. Hiller refused to sign the complaint, greatly to the surprise of her friend and the attorney. She stated to them: "If I could believe what you say, O, don't know, I might sign the complaint." When the attorney asked her for the third time to sign the complaint, she said: "No, I cannot sign that complaint." None of this testimony is denied by Mrs. Hiller. Alexander and her attorney were unable to understand her refusal to sue. A natural explanation is that at that time she knew and remembered all the circumstances of the transfer of the stock in the Hayward pool, and knew that she had no cause of suit against W. S. Ladd, and that she did not care to disclose J. Wesley Ladd's relation to the Hayward pool, and at that date still respected his wish in that regard. But, whatever may have been her reason for refusing to bring the suit, it is evident that her attention was then directed to the fact that, in addition to the 950 shares of stock in the Oregon Steam Navigation Company which she then held, there had formerly been a large holding of Oregon Steam Navigation Company stock belonging to her estate. Van Bokkelen testified concerning the settlement of 1880 that W. S. Ladd did not refuse him any information or assistance; that he had no pointed questions to put to W. S. Ladd; but that he did inquire in reference to the money which came through C. E. Tilton, and said that he could not see how certain property there accounted for came in Mrs. Hiller's possession; and that W. S. Ladd answered: "If Mrs. Hiller has anything in those books more than appears to belong to her, it got there honestly." Van Bokkelen testified that he reported this answer to the complainants, and that he thinks he told them that he was not wholly satisfied, and that there ought to be more light on that item of the account. The testimony shows clearly that all of the information on which the present suit was brought was in the hands of the complainants and their accountant, or was available to them, at the time of the settlement in

1880. It is not disputed that the books and papers which were surrendered to Mrs. Hiller prior to the settlement of 1880 contained entries sufficient to convey the information that J. Wesley Ladd, at the time of his death, held 7,600 shares of Oregon Steam Navigation Company stock. Van Bokkelen and Blinn, witnesses for the complainants, testified that from entries on those books and papers, and without other information, they deduced the facts in regard to said holding of stock and the number of shares thereof. Upon their own showing, therefore, the complainants had in their possession, at the time of the settlement, data sufficient to inform them or to put them upon inquiry concerning all the facts regarding the Oregon Steam Navigation Company stock.

If it were to be conceded that Mrs. Hiller did not, during the time covered by the probate proceedings, know that nearly all of her husband's estate consisted in Oregon Steam Navigation Company stock, and that she was not aware of the contents of the paper which she signed, consenting to the division of the estate, and never learned those facts until shortly before the commencement of the present suit, and if she had never made the settlement of 1880, her laches would, nevertheless, bar her from recovery in this suit; for it is not disputed that she was one of the executors of the will, that she knew the provisions of the will, and knew that she signed a paper consenting to a distribution. The records of the probate proceedings were at all times accessible to her. How much the more do her laches bar her when we consider that she does not deny the positive and credible testimony of other witnesses, and the statements of her own letters, showing that she had full knowledge of all her rights in the stock held in the Hayward pool, and of her rights under the will, at the time when she consented to the distribution of the estate, and that thereafter her memory was refreshed in regard to these matters, in 1874, when a complaint was prepared and read to her, but she declined to bring the suit, and again in 1875, when she sent to W. S. Ladd J. Wesley Ladd's trial balance, and made inquiry concerning certain items thereof, and again in 1880, when all prior transactions were brought under review, and a general settlement of them was effected? It is not claimed for the appellants that, after the settlement of 1880, new facts concerning the Oregon Steam Navigation Company stock came to their knowledge before bringing this suit. They allege in the bill, it is true, that they had heard rumors to the effect that they had been defrauded in reference to that stock. What the rumors were, or whence they emanated, is not disclosed in the testimony. Van Bokkelen accounts for the commencement of the suit in a way which seems reasonable and probable. He says that Dr. Hiller came to him about March 30, 1892, and told him he wanted him to take hold of these accounts and re-examine them. "He said he had sent up to Portland, and had them overhauling the books up there, and he then discovered about the repurchase pool matter; and in looking over the O. S. N. Co. stock, and the division of it into six interests, and the fact that the two interests had been held by Quackenbush,—that was what really started me into this investigation." It appears, then, that it

85 F.—46

was the suspicion or the belief that Mrs. Hiller had in fact, and without her knowledge or consent, been made a party to the repurchase pool, and was entitled to a proportion of the profits of that venture, which caused the complainants to bring the present suit.

The appellants make the further suggestion that the trust created by the conveyance and power of attorney of May 16, 1872, continued by the terms thereof until the death of W. S. Ladd, in January, 1893, and that a portion of the trust estate was never accounted for. They refer to a trial balance made for Mrs. Hiller by W. S. Ladd on March 19, 1879, on which appear the following entries: St. Helens property, $125.75; Puget Sound lands, $113.75; Malden, Mass., property, $1,210.98. And they contend that as to these items of property the trust still exists. There is nothing in the evidence to show whether, as to these items, there is now or ever was a trust. The bill does not charge that these properties were included in the trust, or that they have not been accounted for. It contains no mention of them whatever. The deed of trust itself does not specify the trust property. It conveys by general terms the property obtained from the probate court and the property situated in the state of Oregon. There is no evidence that these specified properties are situated in the state of Oregon. In the same trial balance is one other item under the head of "Real Estate," to wit, "Stanley place, $3,000." In the correspondence between W. S. Ladd and Mrs. Hiller, it appears from several references thereto that the rent of the Stanley place for many years was collected by Mrs. Hiller, and that from time to time she accounted to W. S. Ladd for one-half thereof. It is probable that all the items of real estate on the trial balance were entered there for no other reason than that W. S. Ladd, as trustee for the legatees of J. Wesley Ladd's estate, was entitled to receive one-half the rents of the same, and one-half the proceeds thereof whenever a sale should be made. Whether the sale was made and proceeds distributed at the time of the settlement in 1880 or afterwards we have no information, and under the allegation of the bill, and the evidence, we have no warrant for entering any order or decree concerning the same. We can conceive of no interpretation of the facts in this case which will entitle the appellants to relief in a court of equity. The decree of the circuit court will be affirmed, with costs to the appellees.

ROSS, Circuit Judge (concurring). I am unable to concur in the foregoing opinion in respect to the merits of this cause, but concur in the judgment on the ground of the complainants' laches.